AO 243 (Rev. 09/17)

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| United States District Court | District Eastern District of Virginia | |
|---|---|---|
| Name *(under which you were convicted)*: Zachary Adam Chesser | | Docket or Case No.: 1:10-cr-395-LO-1 |
| Place of Confinement: FCI McDowell Welch, WV | | Prisoner No.: 76715-083 |
| UNITED STATES OF AMERICA v. | Movant *(include name under which convicted)* Zachary Adam Chesser | |

**MOTION**

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   Eastern District of Virginia - Alexandria Division

   (b) Criminal docket or case number (if you know): 1:10-cr-395-LO-1

2. (a) Date of the judgment of conviction (if you know): _____

   (b) Date of sentencing: February 2011

3. Length of sentence: 300 months BOP / 3 years supervised release

4. Nature of crime (all counts):

   * Count One - Communicating **Threats**, 18 U.S.C. § 875(c)
   * Count Two - Endeavoring to Persuade Others to Commit a Felony with the **Threatened** Use of Physical Force as an Element, 18 U.S.C. § 373, which was Conveying False Information about Alleged Attempts, §§ 1038 & 1992(a)(9), to **Threaten**, § 1992(a)(10), to Endanger others on Mass Transportation, § 1992(a)(2).
   * Count Three - Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B

5. (a) What was your plea? (Check one)
   (1) Not guilty ☐   (2) Guilty ☑   (3) Nolo contendere (no contest) ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   I pled to an information (Doc. 28), but my Statement of Facts (Doc. 32) includes two forgone charges related to Count One: Endeavoring to Persuade Others to Engage in Conduct Constituting a Felony with the Use, Attempted Use, or Threatened Use of Physical Force as an Element (§ 373) with Stalking (§ ) and Acts of Terrorism Transcending National Borders (§ 2332b) as predicates. Only the latter is "more serious" and potentially relevant.

6. If you went to trial, what kind of trial did you have? (Check one)   Jury ☐   Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☐   No ☐

PAGE 1

AO 243 (Rev. 09/17)

8. Did you appeal from the judgment of conviction?     Yes ☐     No ☑

9. If you did appeal, answer the following:

   (a) Name of court: _____

   (b) Docket or case number (if you know): _____

   (c) Result: _____

   (d) Date of result (if you know): _____

   (e) Citation to the case (if you know): _____

   (f) Grounds raised:

   (g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☐     No ☐

    If "Yes," answer the following:

    (1) Docket or case number (if you know): _____

    (2) Result: _____

    (3) Date of result (if you know): _____

    (4) Citation to the case (if you know): _____

    (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
   Yes ☑     No ☐

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court: _Same_

     (2) Docket or case number (if you know): _Same_

     (3) Date of filing (if you know): _2016_

PAGE2

AO 243 (Rev. 09/17)

(4) Nature of the proceeding: Original 2255

(5) Grounds raised: There are too many to list, but, to make a long story short, the gist of both claims I am now raising was in my original 2255. Judge O'Grady denied it. In doing so, he addressed the claim similar to the one about Count One, although he did not actually say anything pertaining to the substance of my current claim on Count Two.

The Fourth Circuit, however, authorized this second and successive 2255 because the Supreme Court issued new First Amendment holdings on true threat and incitement doctrine, In re: Chesser; No. 24-196, so the procedural issue this question gets at has been addressed

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?
Yes ☐    No ☑

(7) Result: Denial

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: Northern District of West Virginia

(2) Docket of case number (if you know): 5:23-cv-234-JPB-JPM

(3) Date of filing (if you know): Spring 2023

(4) Nature of the proceeding: 28 U.S.C. § 2241

(5) Grounds raised:

Count Two's predicate was invalid, because conveying false information about attempts to threaten to endanger others does not have the threatened use of physical force as an element and, among other things, can be violated through lying about attempted threats. United States v. Taylor, 142 S. Ct. 2015 (2022).

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?
Yes ☐    No ☒

(7) Result: Denied due to Jones v. Hendrix, 143 S. Ct. 1857 (2023)

(8) Date of result (if you know): 8/1/23

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:    Yes ☑    No ☐

(2) Second petition:    Yes ☐    No ☑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

To be clear, I petitioned for a COA and lost, but this has been effectively overruled by authorizing a successive petition, since the standards are essentially the same. As for the second, Jones v. Hendrix clearly left a statutory claim futile, even though I'd correctly argued the issue in my original 2255.

AO 243 (Rev. 09/17)

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** Count One violates the First Amendment, because I did not consciously disregard a substantial risk a true threat would be

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): understood by my audience, nor was my speech intended and likely to incite imminent acts of unlawful violence.

For facts, see the typed attachment.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes [ ]    No [ ]

(2) If you did not raise this issue in your direct appeal, explain why:

I did not appeal, but this issue can't be barred by procedural default.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?
Yes [X]    No [ ]

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: 28 U.S.C. §2255

Name and location of the court where the motion or petition was filed:
This court

Docket or case number (if you know): 1:10-cr-395-60-1

Date of the court's decision: Denied

Result (attach a copy of the court's opinion or order, if available):
Doc. 88

(3) Did you receive a hearing on your motion, petition, or application?
Yes [ ]    No [X]

PAGE 4

AO 243 (Rev. 09/17)

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☒    No ☐    (Petitioned for COA)

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☒    No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Fourth Circuit

Docket or case number (if you know): Unknown

Date of the court's decision: unknown

Result (attach a copy of the court's opinion or order, if available):

I lost, but the same Fourth Circuit just authorized these claims because its past holdings were overruled. In re: Chaser, no. 24-106 (4th Cir. 2025)

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:




**GROUND TWO:** Count Two violates the First Amendment because I did not incite true threats against mass transportation and it is facially overbroad.

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):



See typed attachment.




(b)  Direct Appeal of Ground Two:

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☒

**PAGE5**

AO 243 (Rev. 09/17)

    (2)   If you did not raise this issue in your direct appeal, explain why:

(c)  **Post-Conviction Proceedings:**

    (1)   Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☒   No ☐   ( Partially )

    (2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _2255_

Name and location of the court where the motion or petition was filed:

_This court_

Docket or case number (if you know): _This case_

Date of the court's decision: _Doc. 88_

Result (attach a copy of the court's opinion or order, if available):

_Doc. 88_

    (3)   Did you receive a hearing on your motion, petition, or application?

        Yes ☐   No ☒

    (4)   Did you appeal from the denial of your motion, petition, or application?

        Yes ☒   No ☐   ( COA )

    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐   No ☒   ( sort of )

    (6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_Fourth Circuit_

Docket or case number (if you know): _Unknown_

Date of the court's decision: _Unknown_

Result (attach a copy of the court's opinion or order, if available):

_Denied_

    (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

My argument was only very vaguely the same as this one and did not contain facial challenges. When I applied for a COA, I focused much more on statutory grounds, but the state of true threat and incitement law are now much more favorable to my case.

AO 243 (Rev. 09/17)

**GROUND THREE:** _____

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

PAGE 7

AO 243 (Rev. 09/17)

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

PAGE 8

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.  Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

My facial challenge and true threats argument were not precisely presented with respect to Count Two, and my mens rea and "substantial risk" arguments were not presented in the same way with respect to Count One, because the law was not amenable at the time.

This is a First Amendment actual innocence case already authorized by the Fourth Circuit. The issues these questions are getting at do not apply.

PAGE 9

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?    Yes ☐    No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
   (a) At the preliminary hearing:

   _Brian Mizer (unknown) and Michael Nachma-off (this courthouse)_

   (b) At the arraignment and plea:

   _Same_

   (c) At the trial:

   _n/a_

   (d) At sentencing:

   _Same_

   (e) On appeal:

   _n/a_

   (f) In any post-conviction proceeding:

   _n/a_

   (g) On appeal from any ruling against you in a post-conviction proceeding:

   _n/a_

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☐    No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    Yes ☐    No ☒

   (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

   (b) Give the date the other sentence was imposed:

   (c) Give the length of the other sentence:

   (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ☐    No ☐

PAGE 10

AO 243 (Rev. 09/17)

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain
why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This is a second 2255, so it is not subject to that limitation. It was timely filed in the Fourth Circuit, but the Fourth Circuit clerk apparently lost most of my motion, so it was not transferred to this court after it was authorized. Due to complications of a prison transfer, I was not able to discover this for a number of months and my original motion never arrived in my property, so I had to rewrite it. Even though the transfer occurred in March 2025, the BOP did not send me my case file until November 2025. So, to whatever extent timeliness applies, subsections (2) and (4) apply below. In any event, this is an actual innocence petition that happens to be strengthened and founded on the First Amendment, so it is not subject to timeliness issues.

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255,
paragraph 6, provides in part that:
    A one-year period of limitation shall apply to a motion under this section. The limitation period shall run
from the latest of –
        (1)  the date on which the judgment of conviction became final;
    →   (2)  the date on which the impediment to making a motion created by governmental action in violation of
        the Constitution or laws of the United States is removed, if the movant was prevented from making such a
        motion by such governmental action;
        (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has
        been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral
        review; or
    →   (4)  the date on which the facts supporting the claim or claims presented could have been discovered
        through the exercise of due diligence.

PAGE 11

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief: Vacate my sentences and convictions on Counts One and Two, order my immediate release for having served the maximum sentence on Count Three, and allow me to withdraw my plea with respect to Count Three.

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on ___March 2, 2026___.

(month, date, year)

Executed (signed) on ___March 2, 2026___ (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

PAGE 12

## FACTS

Count One stems from a protracted advocacy campaign about the freedom of speech itself, which was covered by media around the world. Count Two is factually much simpler and consists of a few sarcastic paragraphs posted online in an obscure location where it is unlikely anyone sympathetic even saw them. Neither involved incitement nor true threats, as is covered in the accompanying memorandum of law.

It is important to note, before beginning, that I cannot submit or even review classified evidence. Because I am innocent, the FBI's secret FISA surveillance is the clearest and most direct proof of my claims. While those claims stand on their own without that evidence, what the court will be seeing here is a wild distortion of reality. The truth is slanted much more heavily in my favor than even what I will be able to provide in this pro se motion. The court should grant my motion for counsel to have a truly fair proceeding.

Because of the unavailability of this evidence, I am forced to submit a lengthy declaration recounting things I witnessed, said, wrote, thought and did. While such declarations often suffer from problems of credibility, the government could always produce the conversations, emails, online postings, media interviews and other materials to prove I was not telling the truth. I would gladly welcome a full and candid presentation of the full truth in this case, but the government is not likely to do this. The court should not dismiss such a declaration as "self-serving" when it could so easily be refuted if it was not true. The reason it cannot be refuted that I am telling the truth. This includes where my declaration contradicts the Statement of Facts (doc. 32) in this case.

It is worth noting that I never actually swore to or admitted the allegations in my Statement of Facts. While that is the usual procedure, I only ever admitted that the government could have proven its allegations at trial, doc. 32 pp. 1 & 14-15, which is not the same thing as admitting they were true. In my colloquy, I simply said I agreed with my Statement of Facts, which contains this qualifying language, and made a few specific, but ultimately immaterial (or inadmissible--such as my admissions respecting unknown people the government says were probably part of my audience) admissions that hardly covered the whole document. Doc. 30 pp. 12-16. The court should not defer to this document where it is clearly contradicted by objective evidence.

I.    COUNT ONE - The 'South Park' Campaign

Count One and the forgone charge derive from an advocacy campaign I led with Jesse Morton in 2010 with

PAGE 13

our activist group Revolution Muslim. Doc. 28 pp. 6-12; Ex A (Declaration) par. 1. Revolution Muslim espoused

Jihadi views and used inflammatory rhetoric to shock our audiences and gain attention, but we used these

tactics to draw eyes and ears to a more substantive message about wars, exploitation and oppression against

Muslims, and we only ever engaged in nonviolent dialogue and debate, protests, and similar forms of activism.

Id. At the time of the 'South Park' campaign, we had already been thoroughly covered by the media, and it was

well-known that we engaged in political hyperbole and were not a violent organization. Id.This will be

backed up by media articles and even the Department of Justice's own statements to reporters.

In April 2010, the cartoon 'South Park' aired two episodes purporting to "depict" the Prophet Muhammad

(peace be upon him) in a bear costume, although, in order to satirize what the show incorrectly saw as the

source for Muslim outrage over the Danish and Swedish newspaper cartoons depicting him as a dog, a rapist

and a suicide bomber, among other things, the costume turned out to be empty at the end of the episodes.

Id. par. 2. This followed a campaign by the fictional citizens of South Park to get the Prophet (peace be upon

him) to remove the costume, which would then cause him to be depicted. Id. In the episodes, this provoked

Muslims to form a violent mob in order to prevent his depiction. Id. This was all based on a misperception

that Islam's prohibition on depicting faces was the source of Muslim opposition to the Danish and Swedish

cartoons. Id. The show also argued that the exceptional treatment of the Prophet (peace be upon him) was

a threat to free speech, that because the show was an "equal-opportunity offender" Muslims should not be

insulted or hurt by the mockery of the Prophet (peace be upon him), and that causing offense and pain by

mocking the sacred was valuable for its own sake. Id.

I responded by arguing that the issue was denigration, not depiction; that while substantive debate and

disagreement had value, insulting things people held sacred just to hurt and offend them did not have enough

value to offset the harm; that this could be proscribed without fear of a "slippery slope"; that the "equal-

opportunity offender" defense was morally hollow; that the solution to the exceptional status for the Prophet

(peace be upon him) was to extend the same decency to the figures held sacred by other religions and cultures;

that the denigration of cultural and religious symbols and beliefs was a strategy that occupiers and oppressors

used to weaken, delegitimize and exploit subjugated populations; that 'South Park's' creators were unwittingly

facilitating wars, violence and oppression against Muslims, including the wars in Iraq and Afghanistan; that

evaluations of which speech deserved platforming and protection ought to consider the balance of power between

PAGE 14

a speaker and those impacted by their speech and whether that speech facilitated or upheld oppression; and that the spirit of the First Amendment was lost when it was used by the powerful to shield speech that helped exploit and oppress those with less power. Id. par. 3. These are all ideas the court is going to encounter in the speech for which I was charged.

In keeping with Revolution Muslim's modus operandi, I came up with a plan to attract the media and others to our substantive platform on this issue and our criticisms of American wars and foreign policy by (1) predicting the creators of 'South Park,' Matt Stone and Trey Parker, would be killed by others for airing these episodes and (2) advocating the idea that this could potentially be morally justified in Islamic law. Id. However, because I had a layman's understanding of the old objective recipient-based test for true threats after having grown up debating First Amendment issues with a prosecutor mother, I planned to (and did) take extensive steps to make sure nobody could understand me to be threatening or calling for violence and that they would only understand me to be calling for nonviolent protests, dialogue and counterspeech. Id.

The evidence in this case will show that my violent speech was confined to the abstract advocacy of the moral propriety of violence and predictions of third-party violence. It will show that I repeatedly made clear-- in linguistically consistent terms--that this was all I was doing, that I was not threatening or calling for violence, and that I was only calling for nonviolent protests, dialogue and counterspeech. It will show that my audience, which included the show's creators and law enforcement, agreed I'd neither threatened nor called for violence. It will show that I took numerous public and private steps to ensure nobody would view my words as threats or calls for violence and that I (correctly) understood those efforts to be sufficient to ensure my audience would not understand me to be doing either thing. Much of this is indisputably proven by the FBI's own secret surveillance of my communications. While most of this is classified and will require the court to grant counsel to enable me to submit it, the government did declassify a conversation in which I explained that I edited one of the sentences written by Jesse Morton because it expressed support for actual violence occurring.

If the court is able to see clearly through the lingering hysteria of the War on Terror, it will see that this was never a close case. The evidence is overwhelming, but how it was once perceived was distorted by the assumptions of that era. Allah willing, I will now cover that evidence in the following order: (1) my charged communications; (2) uncharged communications that were also part of this campaign; (3) the actual reactions of my speech's actual recipients; and (4) other evidence pertaining to my understanding and intention with respect to my speech

PAGE 15

and its risks.

### A.    The Charged Communications

Count One is based on five communications: (1) my 'Original Posting,' Exs. B & C (doc. 32 par. 23); (2) my 'Defense of the Prophet Campaign Video,' Ex. D (doc. 32 par. 24); (3) my 'Fox News Interview,' Ex. E (doc. 32 par. 26); (4) my 'Clarification Statement,' Ex. F (doc. 32 par. 27); and (5) my 'Tracking Everyone Draw Muhammad Day Posting' (doc 32 par. 31). Two audio clips from the 'Original Posting' are not in my unclassified discovery, so they are presumably classified, although one was identical to the clip in Exhibit D and can effectively be reproduced. Aside from a single sentence, none of the 'Fox News Interview' is declassified, but Exhibit E is a more thorough contemporaneous account from the journalist who interviewed me. The entire 'Tracking Everyone Draw Muhammad Day Posting' is classified, and only a materially false summary the government provided in my Statement of Facts with the outright lie that I posted addresses is declassified. I can only submit a declaration to cover the content of these communications. While some of the classified content is inflammatory, it is all exculpatory, and the court should not simply take the government's word for that content or dismiss what I am saying until it has seen my actual words. The court should grant my motion for counsel so it can see this indisputable proof. With that said, I will now summarize the contents of each communication.

### 1.    The 'Original Posting' (Exs. B & C)

On April 15, 2010, I made my 'Original Posting,' Ex. B, on the websites of Revolution Muslim and The Mujahid Blog (a separate website of mine). Ex. A par. 4.

The posting opens with an image of Theo Van Gogh after he was murdered in response to a film seen as desecrating the Qur'an which he made with Ayaan Hirsi Ali (who will come up a few times in this case). Ex. B p. 1; Ex. A par. 4. It asks if Stone and Parker forgot it, then quotes a media summary of the first of the two relevant 'South Park' episodes, followed by a statement from me that the episode insulted the Prophet (peace be upon him) and did not merely "depict" him and some quotes of viewer comments. Ex. B pp. 1-2. It then asks where they live and includes a link to an article, Ex. C, that mentioned only the town where they live. Ex. A par. 4; B p. 2.

Next, it contains an audio clip from Anwar Al-Awlaki discussing a historical event from fourteen centuries ago, in which a man who'd written poetry trying to incite the pagan Arabs to war against the early Muslims and mocking the Prophet (peace be upon him) was assassinated, which Al-Awlaki used to argue that mocking the Prophet (peace be upon him) was a capital offense in Islamic law. Ex. A par. 4; Ex. B p. 3; Ex. D. Then it says,

PAGE 16

"We have to warn Matt and Trey that what they are doing is stupid and they will probably wind up like Theo Van Gogh for airing this show. This is not a threat, but a warning of the reality of what will likely happen to them. Maybe they have not listened to this lecture before:" Ex. B p. 3. It then includes another audio clip from another lecture mentioning a historical event in which Salah Ad-Din executed a crusader general who had denigrated the Prophet (peace be upon him) while committing genocide. Ex. A par. 4.

Finally, it concludes: "You can contact them or pay Comedy Central or their own production company a visit at these addresses:" and then it posts those addresses, which are clearly labeled "Fan Mail." Ex. B pp. 3-5. The Statement of Facts materially misrepresents and misquotes this section. First, it makes it seem as if the article mentioning the town where they lived was near this section. Doc. 32 par. 23(E). Then it falsely claims that I said my "readers should 'pay them a visit.'" Id. par. 23(F). It is worth reiterating that this misleading document is not actually admissible evidence, unlike the statements of facts in cases where the defendants actually admit the truth of what they contain.

2.    The 'Defense of the Prophet Campaign Video' (Ex. D)

Because the government refused to let me send the court a copy of the actual video, Exhibit D is a true and accurate audio/video transcript of the video I uploaded to the websites for Youtube, The Mujahid Blog and Revolution Muslim on April 18, 2010. Ex. A par. 5. It starts with me summarizing the first 'South Park' episode and then encouraging my audience to raise awareness and repost the video. Ex. D p. 1. Next, it plays the aforementioned Al-Awlaki audio clip over slides of Stone, Parker and various people whom some Muslims had targeted with violent actions or words in the past, including Ayaan Hirsi Ali, whose reaction to my speech (doc. 46-1) will come up later and is attached to the government's sentencing brief. Ex. D pp. 1-4. The video concludes with writing calling on others to join our campaign, re-upload the video, and let Stone and Parker know the controversy was not going away. Id. p. 4.

3.    The 'Fox News Interview' (Ex. E)

On April 19th or 20th, I gave a calm, polite interview with Fox News, in which I explained these postings and expanded upon Revolution Muslim's broader platform, in keeping with our modus operandi of pivoting to a more substantive message once we'd grabbed attention through shocking expression. Ex. A par. 6. I explained that the

PAGE 17

point of the violent expression was to convey the extent to which the episode caused offense. Id. I told him why

we opposed it. Id. In reference to my past prediction, I said, "It's not a threat, but it really is a likely outcome.

They're going to be basically on a list in the back of the minds of a large number of Muslims. It's just the reality."

Id.; Ex. E pp. 1-2. I told Fox Revolution Muslim was considering holding peaceful demonstrations. Ex. A par. 6.

While this interview is classified, it was contemporaneously reported on in the article at Exhibit E, which is an

accurate characterization of my words. Ex. A par. 6. Morton and I did many similar interviews, but these are

all classified. Id.

    4.    The 'Clarification Statement' (Ex. F)

    On April 21, 2010, Morton and I released our jointly-written 'Clarification Statement,' Ex. F, which I posted

to two Jihadi forums since our website was down. Ex. A par. 7. My Statement of Facts inaccurately claims that

I posted this to the Revolution Muslim website, doc. 32 par. 27, even though the government knew this was

not true. Ex. G par. 21 fn. 1.

    This essay opens by calling for and trying to foster "rational" and "productive dialogue." Ex. F p. 1. It then

frames the 'South Park' episodes in terms of American imperialism and violence against Muslims, explaining that

Muslim outrage was tied to how the show upheld the justifying narratives for the oppression and wars Muslims

were suffering. Id. pp. 1-2. It continues this thought by refuting 'South Park's' argument that offending people

just to offend them is vital to free speech, claiming that this was not the intent of the First Amendment and

that a shift to materialistic imperialism caused Americans to start seeing the First Amendment as a tool to

shield the speech of powerful from the weak instead of a tool by which the weak could fight oppression. Id. pp.

2-3. It criticizes the show's "equal-opportunity offender" defense and argues the solution to Islam's exceptional

status is to extend the same decency to other religions. Id. p. 3.

    The essay then covers the idea that Islamic law generally imposes the death penalty for defaming the Prophet

(peace be upon him), id. pp. 3-5, while clarifying that this was not an "absolute call" for that ruling to be applied

to Stone and Parker, nor a "deliberate attempt at incitement," but was simply an effort to "declare the truth

regardless of consequence" and make people in the West aware of the issue going forward. Id. p. 3. It character-

izes this as "forbidding evil" with one's tongue, "[s]peaking out," and "teaching . . . the religion of Islam." Id.

pp. 4-5. It exclusively frames the campaign in terms of expression, not violence; and, although it criticizes the

vast majority of Muslims for failing to publicly condemn the episodes, it does not condemn them for failing to

PAGE 18

use violence. Id.

Next, the essay says, "Thus our position remains that the creators of South Park will indeed end up like Theo Van Gogh. This is reality. . . . We are not trying to directly incite violence, but we are trying to explain the gravity of the situation and prevent this from occurring ever again. . . . [I]f one cannot alter the situation with their hand then they must speak out against it and try to change it that way." Id. p. 5. Then it appeals to Stone and Parker: "We would also like Mr. Parker and Mr. Stone to understand the tastelessness of their portrayals, apologize and reflect on the words that follow. An apology or at least a recognition of bad taste might not remedy the situation, but it would go a long way toward turning this situation from a gaping wound into an ugly scar." Id.

The essay then criticizes Muslims who condemned us on the grounds that they were serving imperialism and oppression. Id. pp. 5-6. It explains how oppressors rationalize their injustices with "civilizing" narratives by portraying the cultures and religions of subordinated populations "as backwards." Id. p. 6. It argues imperialists divide good populations by rewarding "good" collaborators and punishing "bad" resistors." Id. p. 7. And it argues Stone and Parker unwittingly upheld imperialist oppression with 'South Park' and other works, which must be viewed "as part of a broader narrative." Id. pp. 7-8. "We will speak out against the perpetuation of this empire. The South Park episode does that by portraying the most important individual for Muslims, presently the predominant ones being conquered, as backwards and irrational. This gives cause and justification to the narrative the empire is not conquering at all and is instead attempting to liberate." Id. p. 8.

The essay concludes:

> In the end, we seek justice and preservation of Islamic beliefs and culture. We will not stand passive and silent in these tumultuous times. We implore conscious people everywhere to do the same and are open to the advice, suggestions, and general conversation with all those that would like to engage in detailed discussion, we plan on hosting some open dialogue opportunities as soon as our website is back up and running. . . .
>
> We hope that the creators of South Park may read this and respond, that before sending hate mail and condemning us that we may partake in dialogue, and that the Western media's degradation of the most blessed of men ceases. Otherwise, we warn all that many reactions will not involve speech, and that defending [against] those that insult, belittle, or degrade the Prophet Muhammad (peace be upon him) is a requirement of the religion. As Osama bin Laden said with regard to the cartoons of Denmark, "If there is no check in the freedom of your words, then let your hearts be open to the freedom of our actions."

Id.

The Statement of Facts attempts to distort this section by taking the Bin Laden quote out of context to manufacture a linguistic threat against Stone and Parker, doc. 32 par. 27, but this is a hypothesis about the

PAGE 19

likelihood of third-party violence directed at all of mankind that uses this quote as evidence for that hypothesis should people insult the Prophet (peace be upon him) in the future. It is not even directed at Stone and Parker. In prosecuting Morton, the FBI claimed this quote, included in the essay by Morton, not me, was its "most compelling evidence that [we] communicated threats." United States v. Morton, no. 1:11-mj-386-TRJ, doc. 3 par. 31. The most compelling evidence the sun is purple is that it is not green. The sun is not purple. I did not threaten Stone and Parker. The FBI is not wrong that this is their best argument, but "best," like "most," is a relative term.

     5.   The 'Tracking Everyone Draw Muhammad Day Posting' (Classified)

On May 18, 2010, I posted my 'Tracking Everyone Draw Muhammad Day Posting' to the private section of a small, invitation-only Jihadi forum called Ansar Al-Jihad. Ex. A par. 8. This posting collected some of the publicly available Facebook profile information of eleven people who'd joined a Facebook event called "Everybody Draw Mohammed Day." Id. It was scheduled for May 20, 2010, and was a response to my 'South Park' campaign. Id. While I do not have any particular recollection about "JG" and do not even know if I actually said anything about them at all, I did not post very many details about anyone, and the most I posted was profile pictures, the names they used on Facebook and information about organizations they belonged to and institutions they attended which they themselves published on Facebook and made available with a single click on the event they had joined. Id. My only real words in the posting were "Just a place to start," by which I meant "start collecting information," not "start killing." Id. This posting had no violent content at all whatsoever. Id. My idea was that if the event went forward and these people participated in a derogatory way, I would publish the information off of their profiles as a way of letting them know they were still subject to scrutiny. Id. I also wanted to punish Facebook for refusing to cancel the event, which violated its own policies by its own admission, by exacerbating a privacy controversy that was going on at the time. Id. There was a large boycott of Facebook for making too much personal information public by default, and I figured that if that information was collected and published on a Jihadi site, then this would strengthen that boycott's position. Id.

This event had yet to occur. I was not trying to deter anyone I'd mentioned, as they could not even see what I'd said. Id. They had yet to do anything offensive, so I did not have any reason to suggest they might deserve to be hurt. Id. Around this same time, as I will get into later, I mentioned to an interviewer that I did not even think the woman who'd come up with the idea for this event, Molly Norris, had crossed any lines

PAGE 20

so, clearly, people who had merely expressed the idea that they would like to be informed by Facebook when this event took place would not have warranted any sort of violence in my beliefs at the time. Id. I did not think anyone would understand me to be threatening or calling for violence. Id. I was simply collecting information for an idea that I ultimately decided was not worth my time and effort and did not pursue any further. Id.

In addition to its characterizations of my intentions, my Statement of Facts makes other materially false representations. It claims I posted the addresses of these individuals, doc. 32 par. 31, but I did not post a single address, Ex. A par. 8. This is another of the government's outright lies, and it is only getting away with it because this posting is classified and that means it is my word against their (inadmissible) word. This court should appoint counsel so we can let indisputable proof decide such issues. While it is possible that it was just due to some sort of technological illiteracy, the same paragraph in the Statement of Facts claims I posted this in the same "thread" as my 'South Park' postings, insinuating some kind of connection. I definitely did not post this in the same "thread" as those postings, and my recollection is that I did not even post it in the same "topic." Ex. A par. 8. In any case, these topics contained hundreds of threads, and my 'South Park' postings would have been so long buried by then that their presence in the same topic would not have caused anyone to draw any special inferences or connect them. Id.

Because this posting was not even violent, was not very related to my other communications, and could be addressed in its entirety in a few words, this is nearly all that needs to be said on the subject.

6.    A Summary of the Violent Expression and Nonviolent Calls to Action in the Charged Communications with Important Context

It can help to see a categorical summary of my violent speech and some of the speech that the government portrays as dog whistles for violence, because it will make clear that, as awful as my speech was, it neither threatened nor called for violence--let alone amounted to the incitement of imminent acts of violence. Also, it will help to understand some of the context related to Revolution Muslim and what it would take to actually get a Jihadi to act back in April 2010, which was before Al-Qa`idah gave permission to Western Jihadis to act on their own. My speech can be broken down into six categories when it comes to violent expression or expression

PAGE 21

the government tries to portray as violent expression.

First, I predicted third-party violence, while clarifying in every single instance that I was not personally threatening engage in violence. Exs. B p. 3; E pp. 1-2; and F pp. 5 & 8. Second, I posted audio clips by other people discussing historical events no more recent than eight centuries ago, in which people were killed partly for insulting the Prophet (peace be upon him), which those speakers mentioned in favorable terms. Ex. A par. 4; Ex. D.  Third, I advocated the general moral propriety of the death penalty for those who insulted the Prophet (peace be upon him), while clarifying that I was not calling for that idea to be specifically implemented or calling for violence, and that the purpose of this was to raise awareness of the Islamic ruling and also to communicate the gravity of the offense in my view and that of those who shared my opinion. Exs. E; F pp. 3-5. Fourth, I used the existence of these views as evidence for my predictions. Exs. A par. 4; B p. 3; E; F pp. 5 & 8. Fifth, I posted publicly available and legally obtained information from Facebook pages belonging to people who had expressed an intention to participate in a public political event on Facebook along with a suggestion that it would be good to collect more information. Ex. A. 8. Sixth, I called for people to voice their opposition by writing to or visiting Comedy Central and a related production company, Ex. B pp. 3-5, to do so by reuploading a video, Ex. D pp. 1 & 4, and to engage in dialogue and debate, Ex. F pp. 1, 5, 6 & 8.

Part of the essential context here is that Revolution Muslim was known for its political hyperbole using shocking and violent expression to attract attention to a more sober and substantive platform, for being a nonviolent organization in spite of its views supporting violence, and for engaging in exactly the kinds of protests, counterspeech and debate that these communications suggested. Ex. A par. 1.

Also, this speech occurred in relation to a Sunni Islamic context. Ex. A. 9. In the Sunni context, a fatwa is not binding on anyone, but it is necessary for one to be issued before applying a general Islamic ruling to a specific context, which means that, without one, it would have undoubtedly been sinful for a Muslim to do violence against Stone, Parker or JG, even if it ultimately turned out to be the correct ruling, because they would be committing the sin of acting without knowledge. Id. I was a lay Muslim, was not remotely qualified to issue a fatwa, was not issuing a fatwa, would have been ignored had I issued a fatwa, and would have been sinful as well. Id. One of the reasons I stuck to mentioning only the general "fiqh" ruling and not issuing a specific "fatwa," that I did not call for actual violence, and walked this precise line was that mentioning a general ruling was all I was qualified to do. Id. Even as a Jihadi, I believed it would be sinful to do more. Id. And even my Jihadi audience

PAGE 22

would have believed it was sinful to act on my words without an actual Islamic scholar issuing a fatwa. Id.

Another important part of this context was that this was still prior to Al-Qa'idah gave permission to Jihadis in the West to carry out their own independent acts of violence. Id. At the time, Jihadis still required contact and official sanction from an actual militant organization like Al-Qa'idah for any act of violence before they would engage in it. Id.

As long as the court does not succumb, as the government would like, to Islamophobia or the hysteria that characterized the assumptions of the War on Terror, it is easy to understand that I did not mean more than the plain meaning of my words and that there were solid explanations for why I walked the line I walked without crossing it.

B.   The Uncharged Communications

Most of the speech in this campaign was not charged at all, because it is so far from anything the prosecution might use that they could not cite it in making their case. Even the charged communications fall well short of supporting the prosecution's case, but the uncharged communications add powerful exculpatory context. Unfortunately, virtually all of it is classified and can only be reproduced in a general sense from my memory in a declaration and in the few media articles I was able to obtain from prison. While this will convey some of what Morton and I said, it will not communicate the tone, the exact words, the responses of our audience, or the shear volume of mitigating speech that this campaign involved. Even though the unclassified evidence is sufficient, the court should still appoint counsel so this case can stand on the full truth and all the evidence.

Morton and I engaged in multiple media interviews during this campaign. One of these was my interview with CNN, which is partially, but accurately, reported in Exhibit H. Ex. A par. 10. I told CNN that "the purpose of including the Al-Awlaki sermon in [my] posting was to remind Muslims that insulting the prophet is a severe offense for which the punishment in Islam is death." Ex. H p. 2. I also told them my Original Posting "was meant to show those offended . . . how they can voice their opposition, including by sending letters to the South Park's creators. [And that our group was] also considering demonstrations." Id. p. 1. We were calling for "protests, not violence." Id. The article also mentioned past reporting on how, although Revolution Muslim believed violence was justified, it did "not encourage violence on U.S. soil." Id. p. 2. This article notes how we were already well-known for this type of speech. Id. It is not a sympathetic article and cites a former prosecutor and a DOJ official, but it's also not dishonest. Id.

PAGE 23

Exhibit I is a 'New York Times' article for which Morton was interviewed. He "repeated [our] assertion that the ['Original Posting'] was a prediction rather than a threat. He said that the post on [our] blog 'was intended in a principle that's deeply rooted in the Islamic religion, which is called commanding the good and forbidding the evil.' He tied [our] complaints about 'South Park' to larger frustrations about American support for Israel and the wars in Iraq and Afghanistan." Id. p. 3.

We both gave other interviews, all of which calmly explained that we were only predicting third-party violence, were only abstractly advocating the moral propriety of violence in a general sense, and were only actually calling for nonviolent dialogue, counterspeech and protests. Ex. A par. 11. We used these engagements to advocate our more substantive message about the freedom of speech and why we opposed America's policies toward Muslims. Id. These exculpatory communications are, of course, classified. To protect freedom. From itself. Swaddling it in a straight jacket and chaining it to a chair in front of a television playing the truth as told by Uncle Sam. And nothing else.

Or should I pretend this is fair? Use only the flat prose of an attorney who knows there are things we all know but must never say in court?

Morton and I did, in fact, engage in the dialogue and debate we called for, and Morton hosted the "open dialogue sessions" we mentioned in our 'Clarification Statement.' Ex. F p. 8; Ex. A par. 12. We discussed and debated these issues in the media, on websites and via email. Id. We did so in calmly moral and intellectual terms. Id. But the indisputable direct proof for all of this is, yes, classified.

Exhibit J is a verbatim portion of an interview I did with Aaron Zelin (full text at doc. 81-9) prior to my arrest, in which I truthfully discussed these efforts at dialogue. Ex. A par. 13. In addition to being an example of such dialogue itself, I said, "The 'clarification' was issued as a way of changing the dialogue. . . . [A] lot of non-Muslims were willing to discuss various issues and most of them came away with a much better under-standing of the . . . grievances that Muslims hold. A lot of non-Muslims were supportive of what we said." Ex. J p. 2.

We persuaded a lot of people with our arguments. The once-radical points we made about the freedom of speech are not particularly radical sixteen years down the road. Classification distorts the record. It does not allow me to adequately communicate the side of this campaign that persuaded even those who were not predisposed to arguments coming from a group like Revolution Muslim. There is an effect that only comes with

PAGE 24

volume and precise wording and tone. Still, there is ample proof that our audience did not view us to be threatening or inciting violence.

     C.   The Reactions of My Actual Audience

This is the only true threats case since Watts where the audience did not perceive the speaker to be threatening to commit an act of violence. This court previously upheld my conviction on the grounds that this was not dispositive, doc. 88 p. 17, as well as the idea that the abstract advocacy of violence was inherently a true threat, id. pp. 15 & 18-19. But, as the memorandum covers, both of these holdings were invalidated by the Supreme Court. The former is dispositive and advocacy is only proscribable when it amounts to incitement of imminent acts of unlawful conduct. While my audience disagreed in the beginning over whether I had implicitly advocated actual violence or not, there was no perception anywhere close to incitement's standard, and even this disputed idea vanished by the end of the campaign. And that same audience, including the most hostile imaginable members of that audience, agreed I had not threatened to perpetrate any act of violence. While they sometimes framed my speech as a "threat," this was always done from the perspective of it "posing a risk" or was done in a way that clarified they did not consider it to be a "true threat."

Matt Stone and Trey Parker themselves went on camera to say "they're not afraid" and did not believe my words posed a threat. Ex. A par. 14; Ex. K p. 2.

"Police Commissioner Raymond W. Kelley said the New York Police Department was 'aware of the threat, and we've looked at it.' He added, 'We don't think that this threat, as is currently assessed, rises to a crime right now.'" Ex. I p. 3. The NYPD and New York City prosecutors it would have consulted would have been using the old, pre-Counterman standard. Still, even under that test, they were so confident my speech was protected and not a true threat that they were willing to destroy any possible prosecution of our New York-based organization by telling the media we had not broken the law. That is not something law enforcement usually does, even when they do not bring a case.

When Theo Van Gogh was assassinated for the movie he made with Ayaan Hirsi Ali, his killer stabbed a note into his chest, promising Ali was next. She was one of the people I included in my video's slides. She is

PAGE 25

a notorious anti-Muslim hatemonger. Ayaan Hirsi Ali is the author of the only attachment the government used in its sentencing brief to argue I deserved the maximum sentence for damaging, in their not particularly self-aware view, the freedom of speech. Doc. 46-1. They used her 'Wall Street Journal' editorial because it made the Islamophobic argument that every single Muslim was a potential threat to the safety of Matt Stone and Trey Parker and that ideas inherent in Islam made them violent and opposed to free speech. One hopes the government will not repeat these worst tropes of the War on Terror's most hysterical period, but they were not making some sort of narrow point about "Jihadis" and always made sure they vilified Islam and Muslims in a general sense. This is why they turned to Ali to make their point. Yet, Ali explicitly argues that I was innocent and that my speech was protected by the First Amendment.

"According to First Amendment experts," she writes, "technically speaking this posting does not constitute a threat." Doc. 46-1 p. 1. Ali goes on to explain her view that I sincerely was not calling for or trying to incite violence, that I was only raising awareness and engaging in the Islamic practice known as "forbidding evil," and that I did not issue the kind of fatwa that would be necessary to actually incite violence. Id. pp. 1-2. However, she argues that by speaking out and raising awareness, I had increased the risk that Muslims would independently decide to kill Stone and Parker, which, in her view, posed a threat to their safety. Id. Because I had neither threatened nor called for violence and there was a legal consensus that my speech was protected (even under the old standard), Ali argued that the correct way to address my expression was with counter-expression--not with prosecution and the violence of the state. Id. p. 2.

Sufficient proof of how irrelevant the First Amendment became during this era of the War on Terror can be found in how nobody--not even my attorneys--blinked when the prosecution used an editorial arguing I was innocent and that my speech was protected to demand the maximum sentence in the name of defending the freedom of speech.

Other government filings support my innocence. While a filing by the FBI or DOJ would usually be so clearly prejudicial that no court would dare admit it as evidence (or, indeed, statements by the NYPD), it is worth pointing out how even in trying to make me sound as guilty as possible, the government struggled to say I threatened anyone or engaged in anything that would approximate proscribable incitement. Instead, they virtually always accuse my of "posing a threat" and engaging in speech that could be understood as inciteful on some sort of level far below the Brandenburg standard.

PAGE 26

In their sentencing brief, they only manage to accuse me of increasing the risk and posing a threat, not threatening to do violence my own self. Doc. 46 pp. 7-10. In my Statement of Facts, they only manage to allege that my speech "objectively" had an audience that "likely" understood my expression to be calling for violence and "could potentially be willing and capable" of acting on those understandings. Doc. 32 par. 32. And when charging Morton, the FBI also struggled to use the word "threat" in the sense meant by true threat doctrine and 18 U.S.C.  875(c). They claimed my "post engendered significant media attention and public reaction, and was widely perceived as a threat to the safety of [Stone] and [Parker] by implicitly inciting extremists to kill them." Ex. G par. 11. These characterizations all stretch the truth, but "posing a threat" and speech that could be understood as implicitly calling for violence is a far cry from true threats to perpetrate an act of violence or Brandenburg incitement that must be definite, not abstract, and intended and likely to incite imminent acts of unlawful violence.

The same Department of Justice that prosecuted me also originally told the media our speech's precision kept it within the bounds of the law and First Amendment protections. Ex. H p. 2.

These are the most hostile imaginable sources for reactions to my expression, but they all support the idea that I did not engage in true threats or incitement. Not surprisingly, less hostile recipients did not see my speech the same as the government, the NYPD and a notorious anti-Muslim hatemonger.

More neutral observers characterized my prediction as a "warning," Exs. E p. 1, H p. 1, I p. 1, and L p. 2, or an "ominous message," Ex. I p. 1, that "raised concerns that the show's creators . . . might be in danger." Ex. K pp. 1-2. A Buddhist Sri Lankan media outlet even expressed agreement with my message about 'South Park's' denigration of religious figures and reported actions by Sri Lanka's Buddhist-led democracy to restrict the availability of 'South Park' over the way Buddha was portrayed in these same episodes. Ex. L p. 2.

'The Week' used scare quotes when calling my posting a "threat," and it (rightly) portrayed Ali's editorial as sensationalism for suggesting there was any risk at all, quoting actual experts, Leslie Gorstein and Ibrahim Hooper, to point out that I lacked the "credibility" to directly increase the risk of violence to Stone and Parker, let alone incite it. Ex. K pp. 2-3.

CNN recognized my speech was a "call to protest, not violence." Ex. H p. 1. The three experts in the Zelin interview noted the 'Clarification Statement' dispelled perceptions that I might be expressing an "implicit call or at least support for violence." Ex. J p. 2. Former Assistant United States Attorney Jeffrey Toobin said,

PAGE 27

"Certainly the comment on this website is very ugly, but it certainly is not specific enough to get anyone arrested." Ex. H p. 2. That, of course, was based on the clearly erroneous presumption of the rule of law.

D.    My Understandings and Intentions

The objective or risk-based side of the evidence is decisive, so the mens rea side is overkill. My audience of millions--including hostile and unreliable recipients, not just reasonable ones--did not perceive me to be conveying a serious expression that I meant to commit an act of unlawful violence, so there was no substantial risk for me to disregard. Nobody acted on my words, nobody who might have sympathized with them would have acted upon them, and conditional, ambivalent, abstract support for the general propriety of violence while calling for dialogue and debate with the people who had done something which might implicate that general idea simply is not the kind of thing that is likely to incite imminent acts of violence. There is no linguistic or explicit threat or call for violence anywhere in my speech, and everything that one could even unreasonably misconstrue as such was clarified as either a prediction of third-party violence, not a threat, or the abstract advocacy of violence's moral propriety, not a specific call for violence, or as a call for letter writing, counterspeech and protests. Decisive evidence I lacked the requisite mens rea to be guilty of true threats or incitement has already preceded, but there is additional context and even direct evidence that I lacked the required mental states. The best evidence of this was captured by the FBI's FISA surveillance, which intercepted communications between me and Morton strategizing how to benefit from the shock value of violent expression without being misunder- stood as threatening or calling for violence, concrete steps I took to make sure this would not happen, and clear proof that I (correctly, mind you) understood my mitigation efforts to be sufficient. While, as usual, this is mostly classified, the FBI did declassify a piece of one of these exchanges in which I edited out a prayer written by Morton in the 'Clarification Statement,' which expressed support for actual violence against Stone and Parker, and then later explained to him that I did this so we would not be understood as calling for violence.

I had many goals with this campaign, some of which were nobler, and some of which were morally atrocious. Those goals simply did not include threatening or inciting violence against Stone, Parker or JG. Ex. A par. 15. I did not even believe myself capable or inciting such violence and did not believe it would be correct for someone, including myself, to do so without a fatwa and being convinced the fatwa was correct. Id. On the nobler side of things, I really was just using violence to shock people and gain a larger audience for our more substantive views on American foreign policy and the freedom of speech, to provoke debate and to facilitate dialogue, which, as a

PAGE 28

Jihadi, was not easy to do without something to compel attention. Id. I was also sincerely trying to persuade non-Muslims to stop denigrating the Prophet (peace be upon him) and other religious figures with these substantive arguments. Id. Another goal I had was to promote awareness of the general Islamic ruling I believed to be correct, which was that the death penalty applied in cases where someone mocked the Prophet (peace be upon him). Id. And, while I was not certain of a particular result, I was trying stir up enough controversy that a qualified Islamic scholar would issue an actual fatwa as to whether or not that general ruling applied specifically to Stone and Parker (to my knowledge, the only actual fatwas that were given condemned my campaign). Id.

My final goal was possibly my worst. It was certainly the one that did the most actual harm. As much as propagandists try to portray support for the Jihadi cause as driven by some sort of "radicalization" process that is rooted in the study of Islam, a specific Islamic ideology or a combination of these with socio-psychological factors, support for the Jihadi cause is only driven on a causal level by the violence and inequity Muslims experience across the world. Id. It is fundamentally a decision that a militant solution is the most effective way to deal with that, that the Jihadi version of militancy is the superior to other versions, and then that this solution is consistent with Islamic teachings. Id. I had watched a BBC documentary tying greater support from European Muslims for the Jihadi cause to the Islamophobic backlash European Muslims experienced after the Salman Rushdie protests, and this made sense to me as a reason. Id. I saw a similar opportunity in the 'South Park' controversy, and I deliberately caricaturized myself as a Jihadi with violent rhetoric that would appeal to a sensationalist and Islamophobic perspectives. Id. I did this in order to cause that kind of Islamophobic backlash, because I believed that worsening the conditions Muslims faced would motivate more to accept the Jihadi cause as a solution to the inequity and violence experienced by Muslims. Id. I had some awful, atrocious goals with this campaign. They simply did not include threatening or inciting violence against Stone, Parker or JG. Sadly, those innocent Muslims who were the ones who suffered the most lasting and severe consequences of this violent expression and all my other wrongs, did not receive any recognition from the government. Instead, all of the government's filings, like its use of Ali's editorial, seek to paint those same Muslims as threats to freedom and innocent life all around the world, and they rely upon

PAGE 29

bigotry against Muslims in general--as opposed to just Jihadis--to claim my speech must be understood as other than what it meant and said, making innocent Muslims victims of both my campaign and my prosecution. I would ask the court to recognize them, not me, as the true victims here and to see how my convictions for protected expression weigh upon them more than seeing only how it impacted me.

Awful as it was, that speech was protected.

As preceded, Revolution Muslim had a long history of political hyperbole and nonviolent protests and was already known to the public as a nonviolent organization, in spite of its militant views, and I (correctly) believed my speech would be understood in this light, that my predictions would be understood as predictions, and that my calls for nonviolent counterspeech, dialogue and protests would be understood as calling for the very things we so often engaged in. Ex. A par. 1; Ex. H. I was also raised by prosecutors, and, although I did not know the exact details, I knew about the recipient-defined aspect of threat law, and I knew it was important to make sure other people would not understand threats from my speech, which is why I went to such great lengths to clarify my words and leave no ambiguity, although I (correctly) did not expect reasonable people to disregard both the plain meaning of my words and clarifications that nothing more than their plain meanings were intended. Id. par. 3. This campaign also occurred in a context where a fatwa would have to be issued calling for it and a Jihadi group would have to pre-sanction each specific attempt at actual violence before violence was at all likely, and I did not see any risk that my speech would directly incite violence in that context, nor did I expect reasonable people to disregard this reality and replace it with their delusions about Muslims or the mechanics of the Jihadi movement at the time. Id. par. 9; Ex. K pp. 2-3. And it definitely did not occur to me that anyone would understand my republishing of publicly available information with no violent insinuations at all whatsoever to be threatening or calling for violence, especially when the event that was supposed to be taking place had yet to take place and when my posting was not publicly available and could not be seen by these individuals, as I lacked any reason for calling for or threatening violence against them. Ex. A par. 8. Even if one might think I could have wanted to deter these people, I made this posting in private, so it could not possibly have deterred them. Id.

As preceded, we really did engage in the dialogue we were calling for. Ex. A par. 11. And we also really were planning the protests we called for, although we ultimately never had them. Id. These calls were not dog whistles for violence. Id. Especially after CNN and others, Exs. E & H, reported that we were calling "for protests, not

PAGE 30

violence" and that we were considering demonstrations, I believed we had successfully avoided the perception

that we were calling for violence. Ex. A par. 11. Classified evidence would prove all of this beyond any possibility

for doubt, as the FBI recorded and intercepted these communications.

I have consistently denied any intention to threaten or incite violence since the very first posting in April 2010.

Ex. A par. 16. This continued even after I had pled guilty to protect my family from prosecution, when such denials

had no legal relevance, when I stood nothing to gain from them, and in the five-year interval when the government

was totally denying me any access to my case file, as this court has already addressed, making it impossible for me to

evaluate the chances of a postconviction motion. Id. Exhibit M (the entirety of which is at doc. 81-11)

is an essay I published in August 2012, which was mostly about my post-arrest experience, particularly a child

custody case involving my son. Ex. A par. 16. In this essay, I did my best to assume all the guilt for the 'South Park'

campaign and exonerate Morton. Id. Yet, in light of the new recklessness standard, my attempt to assume all the

blame for any potential negligence now reads as a proclamation of my innocence:

> As far as . . . [Morton] is concerned, then I told the government . . . they were incorrect in
> thinking we meant the posts as threats or any of the other things they kept trying to get me
> to say. . . . I was the one who was in charge of removing anything which was remotely threat-
> ening in the press release Revolution Muslim did, and if I missed anything, then it was my
> fault. . . . My posts were the ones which were closer to crossing the line on the matter of being
> a threat, but [Morton] definitely was not trying to threaten anybody.

Ex. M p. 2. This is me saying, "We did not consciously disregard any risk. In fact, we went out of our way to

make sure there was no risk anyone would understand there to be true threats or incitement. But, if anyone

was negligent, then it was me--not Morton." It was an attempt to assume guilt. A failed one, it turns out.

The court does not need to take my word that we took such efforts. For one, many of these efforts played

out in the texts of my writings and the content of my media interviews and preceded. Exs. B p. 3; E p. 1; F

pp. 1, 5 & 8; Ex. H p. 1; Ex. I p. 3. Also, the FBI's FISA surveillance should have intercepted numerous

communications and conversations in which I discussed efforts to avoid these perceptions and made clear

that I did not understand my expression to pose a risk of being understood as threats or amounting to

incitement or even support for actual violence. Ex. A par. 17. While the court will have to appoint counsel

to see most of this evidence--including the most compelling examples--when it was charging Morton, the

government did, in fact, declassify a conversation that suffices on its own.

Special Agent Paula Menges gave a sworn statement that "after considering that an off-the-cuff remark

might establish that [we] intended to incite violence and subject us to criminal liability," Morton and I "decided

PAGE 31

to stop talking to reporters . . . and issue a written statement instead." Ex. G par. 19. This is enough to

find in my favor. Contrary to the FBI's understanding of the law, off-the-cuff remarks are protected, so we were

being so cautious that we were censoring even protected speech to stay well away from breaking the law. But

there is much more.

After this conversation, as Menges notes, I emailed Morton my first draft of the 'Clarification Statement' on

April 20, 2010. Ex. G par. 20. "Early the next morning, Morton emailed a revised draft back to [me], and

suggested [I] then post it on Revolution Muslim's blog. Morton's revision . . . included for the first time the

reference to bin Laden. . . . Also, in this draft, Morton inserted for the first time, 'Thus our position remains

that the creators of South Park will indeed end up like Theo Van Gogh, and we pray that Allah makes this a

reality.' (emphasis added." Id. par. 21 (cleaned up). But I did not do as Morton suggested. Instead, "[I] returned

a third version to Morton in the early afternoon of April 21st, . . . changing Morton's language . . . to 'Thus our

position remains that it is likely the creators of South Park will indeed wind up like Theo Van Gogh. This is

reality.' (emphasis added)." Id. par. 22. "According to the court-ordered intercept of [our] phone call, the

subject of [my] deletion of Morton's words . . . arose in [our] subsequent telephone conversation. [We] were

discussing the opportunity that the South Park controversy provided to disseminate the Revolution Muslim

message." Id. par. 23. I mentioned data showing we'd achieved a high level of online traffic, and "Morton told

[me] that '[the South Park campaign] was very, very, very strategic so far, but we have to be careful, I don't

want to go to prison to be honest with you.' [I] responded, 'That's why I took out your [prayer] in the middle

of the article.' Morton then said, 'oh, we pray that the obligation is fulfilled. Oops. Yeah, yeah, right. I was

a little tired man. I probably didn't think.'" Id.

This shows that I took steps to ensure we would not even be understood as advocating an actual violation

of the law and actual violence, but was insisting on a message of predicting third-party violence and advocating

no more than a general idea that something that would violate the law was morally justified. This is as far from

incitement as such speech can get. It also shows that we were taking efforts to make sure our speech did not

cross First Amendment lines and that we believed we had successfully avoided a risk of being understood as

threatening or inciting violence to that point and at the time I posted the 'Clarification Statement,' which was

the end of my role in this campaign. This is not even negligence, let alone recklessness.

This same affidavit verifies our goals of causing an Islamophobic backlash in line with what followed the

PAGE 32

Salman Rushdie controversy, id. par. 18, and sparking controversy to draw attention to our broader platform on Revolution Muslim, id. pars. 19 & 23.

Exhibit N is a copy of part of my responses in a 2013 interview with the journalist Peter Bergen. Ex. A par. 18. While this was written after my arrest, it was written in the period before the law changed and also before I was able to evaluate a 2255 and know if I had any kind of case. Id. I was also still a Jihadi at the time, and it is very clearly bragging about my Jihadi accolades, not trying to establish my legal innocence. It only manages to do that because the unvarnished and horribly ugly truth happens to do that.

In this interview response, I explained how "[t]wo of my main goals were to make America's Muslim population more reflective of Europe's, and then to make . . . counterterrorism officials freak out and say we were becoming more like Europe, because that seemed to be their doomsday scenario." Ex. N p. 1. This was the type of "worry" I was referencing when suggesting we post the 'Clarification Statement' on unaffiliated Jihadi forums, see Ex. G par. 24, not "worry" that I might commit an act of unlawful violence as the FBI tries to imply. Ex. A par. 18. In this response to Bergen, I go into detail about my goal of causing an Islamophobic backlash and how the protests we planned, but never had, would have helped bring that about. Id. pp. 1-9. I also explain our media strategy of using violent caricature to gain attention while avoiding unprotected speech: "I made the most media enticing post I thought I could without being arrested." Id. pp. 5-6. I mention how my main goal, however, was defending the honor of the Prophet (peace be upon him). Id. p. 6. I also mention how we achieved our goal of broadening our organization's reach. Id. pp. 6-7. Finally, I explain how one of the goals was creating an environment breaking "the stigma, paranoias and barriers which were plaguing Jihadis in America . . . where one feels free to express their views in public and even flaunt them." Id. pp. 8-9.

In other words, one of my goals was ending the censorship Jihadis experienced. Whether one sees that as a noble goal or not, this is the most quintessential First Amendment case in the history of American law. There is no other case so fundamentally about this topic, nor one which implicates so many of the First Amendment's most central ideas.

This interview also resulted in some statements relevant to the JG posting. Id. pp. 10-11. I discussed how

PAGE 33

I did not think that the woman who came up with 'Everybody Draw Mohammed Day' "warrant[ed] being killed," how I saw her as a victim, how I was not religiously qualified to issue a fatwa in either direction, and how the government's framing of how I opposed what some people eventually did with this event was wrong. Id. If I was not supportive of violence against the woman who came up with this idea, it is absurd to think I was threatening or calling for violence against people who had merely expressed that they would like Facebook to notify them when the event took place. I really was just pursuing (a later aborted) plan to hurt Facebook's business by fueling a boycott, see Ex. O, about its privacy policies, the arguments for which would have been bolstered by a Jihadi republishing the information they made available, in order to punish it for hosting that event. Ex. A par. 8. The accusations about JG, even more so than the ones about 'South Park,' are based entirely on an prejudiced reaction to the speech of Muslims--the government did not even have the decency to narrow its position to Jihadis in earlier proceedings.

I had many goals with the 'South Park' campaign. Some of which were terrible. And I very much regret the way I went about this campaign. But it was fundamentally, before anything else, about the freedom of speech. "I feel we achieved a short term objective in the editing of the episode," I told Aaron Zelin, reflecting on the campaign prior to my arrest, "and I think that a dialogue has also started over this issue which will be productive in the long term, in sha'a Allah. A lot of people naturally recognize that there is a difference between wrong speech and that speech which should not be protected. European countries almost all have laws regarding a separation between these two realms of speech. The argument in favor of South Park is either the one of paranoia regarding slippery slopes, or it is the one of the sociopath who thinks there is nothing wrong with trying to harm someone with his words." Ex. J pp. 2-3.

That dialogue continues to this day, and many of the arguments I made about decency, about the feelings of marginalized communities, about the importance of considering the ways speech facilitated oppression, and the importance of deplatforming expression by the powerful when it unjustly harmed victims of oppression and inequity are now staples of a large section of progressive thought on the freedom of speech. My role in that might be lost, and might not be one anyone agreeing with these ideas is likely to cite, but I was the first person to put those ideas in these terms to a large global audience.

There are many who would argue these ideas are opposed to the First Amendment. I would agree. The ideas I held then--and which I hold in a more detailed and nuanced form now--are criticisms of the First Amendment.

PAGE 34

The First Amendment invites criticism. Fundamental to its philosophy is that a robust public debate might eventually result in a better idea than the one embodied in the Bill of Rights. It is most alive when it is being threatened by debate. But when insulating the First Amendment from criticism becomes the justification for silencing that debate with the violence of the state, then the freedoms it cherishes are already dead. The First Amendment may or may not survive a robust and free public debate. But it cannot survive without it.

II.    COUNT TWO - The 'Desensitizing Federal Agents' Posting

Count Two, as discussed in more detail in the memorandum, charges me with endeavoring to persuade others engage in conduct constituting a felony with the threatened use of physical force as an element, in violation of 18 U.S.C. § 373(a). Doc. 28 p. 13; Doc. 31 p. 1. That felony is rather complicated. It is a violation of 18 U.S.C. §§ 1038(a)(1) & 1992(a)(9) by conveying false information about an attempt or alleged attempt to violate § 1992(a)(10) by threatening to violate § 1992(a)(2) by placing any destructive device in, upon or near railroad on-track equipment or a mass transportation vehicle with the intent to endanger others, or with a reckless disregard for the safety of human life. Doc. 28 p. 13. And this is the government-friendly construction. This charge is based upon an online posting, 'Desensitizing Federal Agents,' in which I advocated people leave suspicious but harmless bags in public places with a stated objective of eventually desensitizing bomb squads to the prospect of real bombs. Id. pp. 13-15.

While my Criminal Information mentions three other postings: a TSA Manual, an Air Defense Manual, and a news article that reported a similar suggestion by another Jihadi, it was only the 'Desensitizing Federal Agents' posting that actually encouraged anything at all, and the first two were not even connected to it and are just provided as a sort of hedge in case the court notices the government did not actually accuse me of anything having much to do with the elements of the predicate, especially the element pertaining to mass transportation. Indeed, the court will notice my Criminal Information lacks even standard legal allegations pertaining to those elements. The prosecution, no doubt, will continue its strategy of pretending the predicate does not exist, but the court should not allow that sort of strategy to continue. Similarly, it will, no doubt, persist in its strategy of not actually letting the court see my 'Desensitizing Federal Agents' posting, because allowing the court to actually read my words would be fatal to any argument that they broke the law or were unprotected. Alas, this posting is not in my unclassified discovery, so I cannot do anything to alleviate this problem. Assuming the government did not perpetrate one of the worst Brady violations imaginable and that my attorneys were not

PAGE 35

grossly incompetent, that posting must be in my classified discovery. The court should appoint counsel so that I can rest my case on my actual words and the actual metadata the FBI would have saved, instead of having to rely on my declaration. If not, then it at least should not discount what I am saying about it when I am the one pushing hard to obtain the objective evidence that could prove or disprove what I have to say.

I made this posting on June 15, 2010. Ex. A par. 19. It consisted of just a few short sarcastically-toned paragraphs and was posted to the English section of an Arabic forum called 'Al Fallujah.' Id. That section had few followers, and I usually did not receive more than single-digit views on my postings in this section--most of which came from counterterrorism analysts, bloggers and journalists who followed every single thing I said online. Id. By comparison, I received hundreds of thousands of views each month on other platforms where I had more of a sympathetic audience. Id. If I was seriously trying to persuade anyone to act on this idea, I would have posted it in places where a large sympathetic audience would have read it. Id. It was not a serious suggestion, and it was more of a joke I was pulling on those analysts than anything else. Id. In any case, what I actually said also speaks for itself.

I used a sarcastic tone, not fiery language aimed at incitement, and only wrote a few paragraphs. Id. I was very careful to only advocate conduct that was outwardly identical to the ordinary activity of leaving an ordinary bag or similar object in public, and I did not suggest drawing attention to the bags, reporting them or doing anything other than something outwardly benign in every way. Id. The whole point was that this was a legal and ordinary activity. Id. I did not mention mass transportation or railroad equipment--not even implicitly. Id. I suggested that if enough ordinary and harmless objects were left in public, it would eventually provoke bomb squad responses, and that, eventually, those bomb squads might grow desensitized to the prospect of actual bombs, whereupon a bomb squad tech responding to an actual bomb might be careless and accidentally get themselves killed. Id. I did not suggest actually planting bombs. Id. The idea was that this would facilitate some sort of marginal success for Jihadi groups acting independently from the people leaving bags in public--at least to the extent that this was even a real idea. Even then, it was only a marginal victory for an otherwise failed operation. Id.

The only other posting related to this one was the posting at Exhibit P, which I made on June 8, 2010. Ex. A par. 20. This is only related in a thematic way, as I did not connect my later posting to it. Id. It is merely a reposting of a news article reporting that the FBI was concerned with another Jihadi's call for a campaign of

PAGE 36

suspicious bags. Ex. P. My only words are a single sentence at the very beginning expressing interest in the idea, id. p. 1, and a short paragraph at the very end speculating that the suggestion in the article might be completely legal and wondering if that was so, id. p. 5. It has not call to action from me. While it does report the call to action by another individual, and while it does suggest they thought it could impact public transportation, it does not specify that they suggested placing the bags near mass transportation, id. p. 1, and a bomb squad response quite far from a street would tend to shut down the nearest street. In any case, they are not me. I did not make that suggestion. Exhibit P also shows how this forum's English section was not even suited to the left-to-right pattern of English writing, leaving my posting of this article strangely distorted.

The TSA Manual and Air Defense Manual were posted completely independent of these two postings and had no connection at all. Ex. A par. 21. As the government's own timeline makes clear, the TSA Manual was not even available on my websites after April 2010. Id.; doc. 28 p. 14. The Air Defense Manual was uploaded in a file containing over two hundred other books, and I did not say one single word or do one single thing to draw attention to it among this large library of material. Ex. A par. 21. Other than mentioning that one could download the TSA Manual and download over two hundred books on Islam and jihad, I did not express anything at all whatsoever in these postings. Id. Neither would assist a person in leaving a harmless bag in a public place, whether on a plane or not. Id. These allegations are just the government's attempt to avoid sanctions for a frivolous charge should the court actually read the predicate and notice that I'm not accused of saying anything about mass transportation. The idea that I have expressed some sympathy with harm to mass transportation at other points in my life is not remotely sufficient to establish evidence of the elements of my actual charge. Entering a bank on Tuesday and getting into an argument in a grocery store on Wednesday is not bank robbery.

The elements of Count Two and what I actually said have very little in common. Even without incorporating the elements for incitement and threats under Brandenburg and Counterman.

PAGE 37

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of ___March___, 2026, I placed a true copy of the forgoing filing in the mail, with prepaid first class postage, addressed to:

Gordon Kromberg
Assistant United States Attorney
2100 Jamieson Ave
Alexandria, VA 22314

Zachary Adam Chesser

PAGE 38